## BUSBY v. INTERNATIONAL PAPER CO.
### Civ. A. No. 2452.

United States District Court
W. D. Louisiana, Shreveport Division.

Oct. 27, 1949.

Malcolm E. Lafargue, Irion and Switzer, Shreveport, La., for plaintiff.

Dan W. Stewart, Minden, La., Madison, Madison, Files & Shell, Bastrop, La., Tucker, Bronson & Martin, Shreveport, La., for defendant.

DAWKINS, Chief Judge.

Defendant has moved for a judgment in its favor notwithstanding the verdict of the jury, and in the alternative, for a new trial, on numerous grounds, set forth in the motion.

Without finding it necessary to recite or discuss the grounds at length, it is sufficient to say that in this Court's view, the one entitled to serious consideration is the alleged excessiveness of the verdict. As the Court instructed the jury, all these items of alleged damage (this being an action sounding in tort) which were clearly shown to have accrued more than one year prior to the filing of the complaint on July 23, 1948, were prescribed under the provisions of the Louisiana Civil Code, Article 2315.

The total claimed was the sum of $32,300.00, consisting of the following:

| | |
|---|---|
| "Devaluation" of cattle | $ 7,900.00 |
| "Destruction of business of renting boats to fishermen and duck hunters" | 10,000.00 |
| Damage to wire fences | 500.00 |
| "Diminution in value of 278 acres of land thus lessening the value of the sale price of the property on account of the condition created, at $50 per acre." | $13,000.00 |

The item of renting boats was eliminated from submission to the jury because the evidence clearly showed that whatever damage may have been thus caused had accrued years before the suit was filed; and the claim for destruction of the fences was also left out for the reason it had prescribed.

The total quantity alleged in the complaint was 278 acres of land, but the plat or map, Exhibit P-6, offered by plaintiff, shows that 222.5 acres stood in his name, while 45.5 acres belonged to his wife, amounting altogether to 267.64 acres.

Back in the early 1930's an aerial map was made of the entire property by a governmental agency, referred to in the testimony as the "Triple A", and while concededly not accurate in the minutest detail, plaintiff admitted that "it looks about right." The total crop land, meaning, no doubt, cultivated or subject to cultivation, was shown on this map as 62.9 acres. Of this, parcels Nos. 1, 2, 3 and 5 on the map, embracing 24.5 acres, was on the property of Mrs. Busby, except parts of parcels 1 and 2, amounting to about 4 acres, leaving some 20 acres to be deducted from the whole 62.9 acres, or a balance of some 43 acres of cultivatable land on plaintiff's property. Thus, it appears, long before the defendant began operations, plaintiff's use of the property for raising crops was confined to not more than 1/5th of his entire holdings. Of this amount, the portions of the cultivatable land subject to overflow were parcels 17 and 19, shown on the Triple A. Map, consisting of 6.4 acres and 6.5 acres, respectively, or a total of 12.9 acres, which was about three feet higher than the lake bed. The land around plaintiff's house did not overflow at any time. All the remaining land subject to annual overflow was used for pasture, amounting to 160 acres. Plaintiff testified that he never had cultivated more than 35 to 40 acres of the land subject to overflow, including the 12.9 acres shown on the Triple A. Map. Deducting the maximum fixed by him of 40 acres would leave, according to his own testimony, approximately 160 acres in this swamp bed or bottom, which he used for pasture. (See p. 37 of note of evidence.) "Generally speaking", this 160 acres "overflowed every year", although plaintiff stated he had seen years when it did not.

From this it appears, apparently undisputed, that insofar as cultivatable land, suitable for the raising of crops, was concerned, conceding that the water added by defendant to the normal overflow during the rainy season was sufficient to prevent the cultivation of this approximately 40 acres each year, the proven net value of the crops or profit that could be realized therefrom would have to be figured on an annual basis. All of that which accrued prior to July 23, 1947 had prescribed when this suit was filed. While none of the 40 acres was river land, it was in the bayou bottom and could be counted on to produce better crops than hill land. But, at the most, it would not exceed one-half bale of cotton to the acre. With cotton selling during the period involved for approximately 30¢ per pound, twenty 500 pound bales from this 40 acres would bring a gross of $3000, to which would be added the seed, amounting to some ten tons (approximately 1000 pounds to the bale) at the market price of about $45 per ton or $450, which added to the value of the cotton would make $3450. From this would have to be deducted not less that 2/3ds of the gross for cost of raising, gathering, marketing, taxes, etc., and leaving net about $1150. This, of course, does not allow for droughts, extended natural overflows, boll weevil, etc.

On the other hand, if the damage was treated as permanent because of the annual discharge, so as to affect the sale price of the property, it occurred considerably more than one year before the filing of this suit and has prescribed.

Passing to a consideration of the damage to the pasture land, much the same situation applied. Plaintiff would be entitled to either a fair rental value of some 160 acres of land for pasture purposes or, if prescription had not already run, the diminution in its value, if the conditions were conclusively shown to be permanent. However, there is much evidence in the record which tends to show that whatever damage there might have been was not permanent in the sense of the law, but depended upon the conditions prevailing each year. During a goodly portion of the time since the discharging of "black water" into Bodcaw Bayou began, it has usually started in No-

vember and passed off before the crops were ready to be planted in the spring, and also permitted the use of pasture land, through much of the spring, summer and fall except when prevented by extended rains, or, as in the spring of 1948, by second discharge from the mill. It is believed that this conclusion is supported by a fair consideration of all the evidence and that there is no substantial proof to the contrary. Actual photographs of the pasture land showed, in those areas which were not so thickly covered with trees and bushes that it could not grow at all, after the water, including that discharged from the paper mill, went down, grass came up in sufficient quantities to afford grazing for stock. The bed of this lake has been allowed to grow up with trees and bushes to the point where photographs show that it is so thickly covered that it is difficult to see the ground in most places. However, in the spring of 1948, which, as above stated, includes a part of the year as to which prescription had not run when this suit was filed, the defendant made a second discharge of its "black water", which could possibly have destroyed the benefits of this pasture for that year; but, in no event, taking the evidence in the light most favorable to the plaintiff, is it seen how this could have exceeded $10 per acre or $1600.00. The item claimed for fence must be eliminated because it was destroyed more than a year before the filing of the suit.

The second discharge had its effect also upon the cultivatable land in the same period and this is the basis for the conclusion that allowance should be made for the inability to grow crops thereon in that year.

Adding the damage to the farming land of $1150.00 to the pasture areas, makes the sum of $2750.00

The proof as to damage to the livestock, is, to say the least, most inconclusive, but it is not seen how it can exceed the sum of $1000.00.

It is not believed that giving the fullest effect to plaintiff's version of the evidence, the other inconveniences caused by the presence of decaying fish and incident thereto, could exceed the sum of $1250.00.

 For these reasons it is the conclusion of this court that the verdict is grossly excessive and unless the plaintiff enters a remittitur for all that portion of the verdict in excess of Five Thousand Dollars, within twenty days, a new trial will be granted.

The injunction feature will be considered separately.

Proper decree should be presented.